BELL et al. v. ARLEDGE et al.

(Circuit Court of Appeals, Fifth Circuit. January 23, 1912.)

No. 2,055.

1. BANKRUPTCY (§ 451*)—REVIEW OF ORDER—PROCEDURE.

Appeal lies to the Circuit Court of Appeals to review a decree affirming an order of a referee in bankruptcy, directing payment of allowed claims as liens.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 451.*

Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

2. BANKRUPTCY (§ 348*)—LIEN CLAIMS—SALARIES.

A messenger and bookkeeper and a shipping clerk and lumber checker employed by a bankrupt lumber company at the time of the adjudication are entitled to liens for their wages.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 536; Dec. Dig. § 348.*]

3. BANKRUPTCY (§ 348*)—CLAIMS—RIGHT TO LIEN.

On bankruptcy of a lumber company, a mercantile firm, which furnished supplies to the company's employés on time checks issued by the company, is not entitled to a laborer's lien for the amount remaining due on the checks by subrogation to the employés' rights, where it ap-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pears that the firm relied on the company's credit, and that the claim of lien was an afterthought.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 348.*]

Shelby, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of Texas.

In the matter of the Long Leaf Lumber Company, bankrupt. From a decree of the District Court affirming an order of the referee directing certain payments, W. A. Bell and others appeal adversely to E. C. Arledge, trustee, and others. Partly affirmed and partly reversed.

Newton C. Abbott, for appellants.

W. L. Hill and O. T. Holt, for appellees.

Before PARDEE and SHELBY, Circuit Judges, and GRUBB, District Judge.

PARDEE, Circuit Judge. January 3, 1908, the Long Leaf Lumber Company, engaged in the general sawmill business, was adjudged a bankrupt. In September, 1906, when the bankrupt commenced business, it purchased from L. D. Menefee and W. A. Bell its entire plant, consisting of all the timber, timber lands, mill, dwelling houses, and other property of which it was possessed at the time of the decree in bankruptcy. In making such purchase only a portion of the purchase price was paid, and a vendor's lien was retained and deed of trust given by the bankrupt to secure the payment of the balance of the purchase price.

While the bankrupt carried on business, appellee Stone was employed as a messenger and bookkeeper, and at the date of the adjudication in bankruptcy claimed to be entitled to $789.35 for wages, for which he claims a laborer's lien upon the property of the bankrupt. $300 was paid by the referee, and this claim was thus reduced to $489.35.

Appellee Watts worked for the bankrupt as a shipping clerk and lumber checker, and at the date of the adjudication claimed as due to him $290 for wages, for which he claimed a laborer's lien upon the property of the bankrupt. His claim has been paid except $141.05.

Appellees Holland & Weisinger were merchants located near the mill, and, during the time the lumber company was a going concern, by agreement with the bankrupt were supplying commissaries to the millmen, taking in payment orders or time checks issued by the bankrupt, and they claimed an indebtedness of $1,708.60 arising from the payment of orders and the taking up of time checks, and they claimed as assignee and subrogee of undisclosed laborers' liens a lien on all the property of the bankrupt for the payment of the same.

Bell and Menefee, holders of the deed of trust claiming a vendor's lien, proved their debts reserving their rights under the vendor's lien and deed of trust, and thereafter applied for the sale of all the mortgaged property of the Long Leaf Lumber Company for the satisfac-

tion of their claims, and, in furtherance of such sale, entered through their counsel into the following agreement, to wit:

"State of Texas, County of Harris.

"This agreement witnesseth:

"That W. L. Hill presents a number of the creditors of the Long Leaf Lumber Company, bankrupt, claiming to have laborers' liens upon the property of the Long Leaf Lumber Company for labor performed, and that said liens arise and are fixed by the labor performed, and that said liens arise and are fixed by the law. I. M. Standifer represents L. B. Menefee and W. A. Bell, who claim to have a mortgage on all the property of the Long Leaf Lumber Company upon which W. L. Hill claims the laborers' liens apply. The mortgage creditors L. B. Menefee and W. A. Bell have applied for the sale of all the mortgaged property of the Long Leaf Lumber Company for satisfaction of their debts.

"Now, therefore, it is agreed between I. M. Standifer representing L. B. Menefee and W. A. Bell, and W. L. Hill representing certain creditors claiming to have laborers' liens, that the property upon which the mortgage is claimed to exist may be sold under the application of L. B. Menefee and W. A. Bell, and that the liens of the creditors represented by W. L. Hill shall attach to the proceeds of the sale of the property sold, if such liens exist, and shall be paid off and discharged by said Menefee and Bell, if the courts shall so adjudge, and that the persons represented by W. L. Hill shall in no wise be prejudiced as to their lien or the payment of any lien established by them by virtue of the sale of the property under the application pending, but that said Menefee and Bell will pay off and discharge any final judgment which may be rendered in favor of W. L. Hill's clients against the Long Leaf Lumber Company in which a lien or liens may be held to exist in their favor upon or against said property.                    [Signed]  W. L. Hill,
                                                        "I. M. Standifer."

Upon a hearing before the referee the claims of appellees Watts and Stone and Holland & Weisinger were allowed by the referee, and by him adjudged to be liens upon the property of the bankrupt, and gave a judgment against Bell and Menefee directing them to pay the same.

Exceptions being filed to the findings of the referee, the matter was brought before the District Court, where, on hearing, the exceptions to the findings of the referee were overruled, and the referee's findings were in all things confirmed and approved. Bell and Menefee sued out this appeal with detailed assignments of error, denying and disputing the claimed liens of Stone and Watts and Holland & Weisinger.

[1] A motion is made to dismiss this appeal on the ground that no appeal lies under the statute, and that appellants' remedy, if they had any in this court, was by petition to revise.

This court ruled adversely to such contention in Roche-Smith v. Mortgage & Debenture Co., 101 Fed. 956, 42 C. C. A. 115.

[2] As to the right of appellee Stone and appellee Watts to the lien they claim, we agree with the referee, and we concur in his conclusion of law and argument thereon. As to whether these liens are prior to the vendor's lien of Bell and Menefee, it is not necessary to inquire, in view of the agreement between the parties hereinbefore fully given.

[3] As to Holland & Weisinger the case is different. In their first claim Holland & Weisinger proved their debt for goods, wares, merchandise, and money advanced to the bankrupt in the sum of $1,708.66, claiming, however, no lien, but asserting security as follows:

The bankrupt sold 1,100,000 feet of lumber to L. M. Matthews with the condition that the proceeds should be applied to the payment of this claim. The account stated in the proof of debt is as follows:

Long Leaf Lumber Co., to Holland & Weisinger:

| | | | |
|---|---|---|---|
| Nov. 1. | Balance | .........$1,123 | 23 |
| Nov. 1– 5. | Suit, $15.00; files, $1.00; 20 chops, $31.00............ | 48 | 00 |
| Nov. 1– 5. | Order P., $15.70; fruit. $5.05; chops, $132.55.......... | 153 | 30 |
| Nov. 1– 5. | Syrup, $1.00; shells, 50¢.............................. | 1 | 50 |
| Nov. 6–15. | Tobacco, 95¢; coffee, $3.00; tobacco, $1.20............ | 5 | 15 |
| Nov. 6–15. | Lard, $6.30; flour, $5.60; meal, $2.60................ | 14 50 |
| Nov. 6–15. | Ham, $7.85; shoes, $1.40; pants, $1.50................ | 10 | 75 |
| Nov. 6–15. | Shoes, $3.75; overalls, $2.00; syrup, $1.00............ | 6 | 75 |
| Nov. 6–15. | Onions, 50¢; hose, 25¢; chops, $1.60................. | 2 | 35 |
| Nov. 5–15. | Shoes, $3.25; plaids, $1.50; flannell, $1.00............ | 5 | 75 |
| Nov. 6–15. | Snuff, 60¢; gloves, $2.30; outing, $1.50.............. | 4 | 40 |
| Nov. 6–15. | Shoes, $4.00; shoes, $3.00; shoes, $3.00.............. | 10 | 00 |
| Nov. 5–15. | Shoes, $2.50; shells, $1.50; meal, $3.25.............. | 7 | 25 |
| Nov. 5–15. | Shoes, $2.55; underwear, $2.00; bacon, $1.10.......... | 5 | 65 |
| Nov. 6–15. | Merchandise, D. A. S., $10.00; thread, 25¢; tobacco, $1.00 ......................................... | 11 | 25 |
| Nov. 6–15. | Merchandise, P. R., $11.25; merchandise, Simmons, $7.50 | 18 | 75 |
| Nov. 6–15. | Merchandise, W. H., $10.00; merchandise, Tom C., $13.50 ......................................... | 23 | 50 |
| Nov. 6–15. | Checks, pay rolls, $8.25; Phillip Stewart, $11.25...... | 19 | 50 |
| Nov. 6–15. | Bill Jackson. Time, $16.85; checks, $205.55.......... | 222 | 40 |

$1,693 98

Eight per cent. interest per agreement, T. W. Ford, from December
1, 1907.........................................     14 68

Total ......................................$1,708 66

Three months later they filed another proof of debt for goods, wares, and merchandise advanced to said bankrupts and to laborers at and about the sawmill of said bankrupt in the sum of $1,713.59. In this proof of debt the security on the sale of 1,100,000 feet of lumber is retained; but, in addition thereto, "affiant claims a laborer's lien under the laws of Texas."

The account accompanying this proof of debt is a detailed one running from July 1, 1907, for merchandise of various kinds, charged on different days, with no mention whatever of names until the items entered on November 15th to November 23d, where the following appears:

| | | | | |
|---|---|---|---|---|
| Nov. "15/23" | To | Mdse., P. Randel, $11.25......................... | $11 | 25 |
| " | " | " Mdse., Simmons, $7.50......................... | 7 | 50 |
| " | " | " Mdse., Will Hawkins, $10....................... | 10 | 00 |
| " | " | " Bill Jackson, time $16.85....................... | 16 | 85 |
| " | " | " Mdse., Tom McCarthy, $13.50.................... | 13 | 50 |
| " | " | " Phillip Stewart, time, $11.25................... | 11 | 25 |

This account amounts to $1,342.59, and along with it there is another account running from July 6, 1907, to November 5th for axle grease, hay, chops, etc., amounting to $774.02, on which is credited $400. We understand this is practically the first account, divided up and itemized; but the lien is claimed for the entire amount.

In their petition filed about one year later they say:

"That your petitioners entered into a contract and agreement with said bankrupt, whereby it was arranged between petitioners and said bankrupt that the manager of said sawmill should issue checks, duebills, and statements of the indebtedness due by said Long Leaf Lumber Company to its various laborers and employés as an evidence of the amount due by said Long Leaf Lumber Company to said laborers, and that petitioners would take up or cash said checks, duebills, and orders, and should be reimbursed by the said Long Leaf Lumber Company for the amount so paid to said laborers."

Stone, witness before the referee, testifies:

"That during said time it was the custom of said company and my custom, as manager of said company, to issue mill checks, duebills, and orders to the laborers for the amounts due them for labor performed. The mill checks consisted of an ordinary check, being a round piece of pasteboard and printed thereon, 'Good for 5 Cents,' ten cents or twenty-five cents or more, as the case might be, and signed the Long Leaf Lumber Company. The duebills consisted of a written statement in substance to the effect, 'There is due...... dollars for labor,' signed by the Long Leaf Lumber Company. These mill checks and duebills and orders were transferable by delivery and circulated as money in the vicinity of the mill. The Long Leaf Lumber Company had an agreement or arrangement with Holland & Weisinger to cash or pay off these mill checks, duebills, and orders with the understanding that at stated times the Long Leaf Lumber Company would pay the said Holland & Weisinger for the amount due them for such items, and from time to time Holland & Weisinger rendered statements of the amounts so due them, and surrendered the mill checks, duebills, and orders, and were paid in accordance with said agreement. At the time of the closing of the business of the Long Leaf Lumber Company it was indebted to said Holland & Weisinger for mill checks, duebills, and orders held by them in the amount of $1,342.59. I am unable to give the names of the laborers to whom said mill checks, duebills, and orders were issued, as it was the custom of the company to keep account of the time due the men and give them credit therefor in the books and the [to] issue them mill checks, duebills, or orders for the amount so coming to them, and no record was kept of said mill checks, duebills, or orders. I am unable to state the particular work done by the holders of said evidences of indebtedness, but all of said mill checks, duebills, and orders were issued for labor done for the Long Leaf Lumber Company in the manufacture of lumber, in the operation and repairing of the machinery pertaining to said sawmill, and in constructing a mill plant, warerooms, laborers' houses, water tank, and in the removal and repair of machinery. * * * The men hereinbefore referred to were employed by the Long Leaf Lumber Company by the day or by the month to work in carrying on the general business of the company, and I do not know the time when any particular man worked."

Watts testified, among other things:

"Q. How did you pay the labor—that is, state to the court whether or not you ever paid the labor by orders on Holland & Weisinger and how the arrangement was? A. From July up to some time in November or later on we would give the laborers an order on Holland & Weisinger for groceries, dry goods, or whatever they wanted, to whatever amount wanted. I gave several orders myself. We would first look on the book to see what amount of time was due the laborer, and then, if he had as much time on the book as he wanted an order for, we would give him that amount; but, if he did not have as much time on the books as the amount of order wanted, I would reduce the amount of the order to the amount of time on the book.

"Q. When you were paying a laborer you figured how much time was coming to him? A. Yes, sir.

"Q. And if he wanted to be paid you would give him the statement of that

fact to Holland & Weisinger, was that the way of it, an order, or whatever you call it? A. I never gave them a statement. If he wanted an order for $10, I would look on the books to see if he had $10 time coming to him, and, if he had, would give him an order for $10 in dry goods or groceries, or whatever he wanted.

"Q. In how many instances did you do that? A. I did that, I think, in five instances myself.

"Q. You have examined this account here of Holland & Weisinger—or have you? A. No, sir; I have not.

"Q. These orders were given on Holland & Weisinger in payment of the men for labor that they had done? A. Yés, sir; and also there was an arrangement made with them whereby they would take time checks. (Mr. Standifer, for creditors, objected to this.) They also gave time checks to Holland & Weisinger; that is, time checks for a man's work. Say he worked to-day, and we paid him to-night. In this way he would take his time check down there to the commissary. They did not have much, and, if they did not have it, he would take it to Holland & Weisinger, the time check for $1 or $1.50, or whatever amount it might be for. These checks run from 5 cents to $1. I have some of them.

"Q. Show them to the court."

Check for five cents on the Long Leaf Lumber Company was introduced in evidence bearing on one side the following:

"On or before ten years after October 20, 1906, without interest. Long Leaf Lumber Company promises to pay to bearer 5 cts., Houston, Texas.

"O. M. Stone, Mgr., President."

And bearing on the other side the following:

"This note is not valid unless signed in ink by the president of the company."

Mr. Holland testified:

"Q. Examine that account there—the first two pages of the account. For what were those items named there advanced and to whom? State in a general way. A. Why, in taking these orders, Mr. Stone and Mr. Watts would send us orders for groceries or dry goods.

"Q. You let the laborers have the items named there? A. Yes, sir.

"Q. I mean men working for Long Leaf Lumber Company? A. Yes, sir; those who had time with the Long Leaf Lumber Company.

"Q. You made these advances on the instruction of the Long Leaf Lumber Company? A. Yes, sir.

"Q. Were all of the advances made on orders, or did you have checks for some of them? A. Had checks for some of them I think.

"Mr. Standifer: Q. Produce the checks.

"Mr. Hill: Q. You took checks for what amount? A. $205 and some odd cents.

"Q. Where are those checks? What did you do with them? A. Gave them to you.

"Q. I will put them in some other time if Mr. Standifer wants them. Each of the items in that account amounting to $1,842.59 were actually delivered to laborers here working for the Long Leaf Lumber Company. I ask you if these items in this account were actually delivered to laborers of the Long Leaf Lumber Company for work performed for the Long Leaf Lumber Company. A. Yes, sir.

"Q. None of these items in this $1,300 account were delivered to the Long Leaf Lumber Company itself? A. No, sir; it was a separate account with the Long Leaf Lumber Company.

"Q. Not included in this? A. No, sir."

From the above and foregoing, it is apparent that Holland & Weisinger, in all matters involved in their account herein, whether in sell-

ing goods and merchandise, taking up scrip, paying checks, or accepting orders, were acting under their agreement with the Long Leaf Lumber Company, and for payment were relying upon the credit of that company; and that the claim of a lien under assignment from laborers was an afterthought. Certain it is that the evidence does not show any assignment of any laborer's claim or lien.

Under the facts in this case, an assignment (to carry a lien) of scrip or duebills, passing by delivery and payable to bearer on or before ten years, cannot well be presumed, and an assignment of laborers' claims, where neither the laborer nor the specific labor is proved, should not be presumed.

The Statute, art. 3339d (Texas Civil Statutes), subrogates assignees, but not every person who may come in possession of the claim. See Union Trust Co. v. Southern Sawmill, etc., 166 Fed. 193–202, 92 C. C. A. 101, and cases there cited.

On the whole case, we conclude that the judgment appealed from should be affirmed as to appellees Watts and Stone, and reversed as to Holland & Weisinger; costs of this court to be divided, one-half to appellants and one-half to Holland & Weisinger. No docket fees. And it is so ordered.

SHELBY, Circuit Judge, dissents.